Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ABDIKARIM KARRANI,

        Plaintiff,

v.

JETBLUE AIRWAYS CORPORATION, a
Delaware corporation,

        Defendant.

No.: 2:18-cv-01510-RSM

DECLARATION OF SAMANTHA PITSCH
IN SUPPORT OF DEFENDANT JETBLUE
AIRWAYS CORPORATION'S REPLY TO
ITS MOTION FOR SUMMARY
JUDGMENT

SAMANTHA PITSCH, declares and says:

1.    I am an attorney at Mills Meyers Swartling, P.S., attorneys of record for defendant JetBlue Airways Corporation ("JetBlue"). I am over the age of 18, I am competent to testify, and I make this declaration based on personal knowledge.

2.    Attached as **Exhibit A** are true and corrects excerpts of the deposition transcript of Michael Cheney dated March 7, 2019.

3.    Attached as **Exhibit B** are true and corrects excerpts of the deposition transcript of Jason Smith dated April 26, 2019.

DECLARATION OF SAMANTHA PITSCH IN SUPPORT OF
DEFENDANT JETBLUE AIRWAYS CORPORATION'S REPLY TO
ITS MOTION FOR SUMMARY JUDGMENT
(NO. 2:18-cv-01510-RSM) - 1

LAW OFFICES OF
**MILLS MEYERS SWARTLING P.S.**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

1    Signed under the penalty of perjury under the laws of the United States of America this

2    21st day of June 2019, at Seattle, Washington.

3

4                                            /s/Samantha Pitsch

5                                            Samantha Pitsch
                                             WSBA No. 54190
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   DECLARATION OF SAMANTHA PITSCH IN SUPPORT OF
     DEFENDANT JETBLUE AIRWAYS CORPORATION'S REPLY TO
     ITS MOTION FOR SUMMARY JUDGMENT
25   (NO. 2:18-cv-01510-RSM) - 2

26

LAW OFFICES OF
MILLS MEYERS SWARTLING P.S.
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON  98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

John P. Sheridan, jack@sheridanlawfirm.com, jamie@sheridanlawfirm.com, mark@sheridanlawfirm.com

Mark W. Rose, mark@sheridanlawfirm.com, jamie@sheridanlawfirm.com, alea@sheridanlawfirm.com

Alea M. Carr, alea@sheridanlawfirm.com, alea.carr@gmail.com

I further certify that I mailed a true and correct copy of the foregoing to the following non-CM/ECF participant:

and correct copy of the foregoing to the following non-CM/ECF participant:

N/A

DATED this 21st day of June 2019.

_____
Legal Assistant

DECLARATION OF SAMANTHA PITSCH IN SUPPORT OF
DEFENDANT JETBLUE AIRWAYS CORPORATION'S REPLY TO
ITS MOTION FOR SUMMARY JUDGMENT
(NO. 2:18-cv-01510-RSM) - 3

LAW OFFICES OF
**MILLS MEYERS SWARTLING P.S.**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

Exhibit A

Page 1

```
 1

 2   IN THE UNITED STATES DISTRICT COURT
     COURT FOR THE WESTERN DISTRICT OF
 3   WASHINGTON AT SEATTLE

 4   - - - - - - - - - - - - - - - - - - - -x
     ABKIKARIM KARRANI,
 5
                   Plaintiff,
 6
                   -against-           INDEX NO.
 7                                      2:18-CV-01510-RSM

 8   JETBLUE AIRWAYS CORPORATION,

 9                   Defendant.

10   - - - - - - - - - - - - - - - - - - - -x

11

12           VIDEOTAPED DEPOSITION of DEFENDANT

13   JETBLUE AIRWAYS CORPORATION, BY MICHAEL

14   CHENEY, taken by Plaintiff at the offices of

15   Fink & Carney Reporting and Video Services, 39

16   West 37th Street, New York, New York, on

17   Thursday, March 7, 2019, commencing at 9:04

18   a.m., before Elizabeth Santamaria, a Certified

19   Shorthand (Stenotype) Reporter and Notary

20   Public within and for the State of New York.

21

22

23

24

25
```

Page 8

1                        Cheney

2    airplane.

3        Q      All right, after the decision to go

4    to Billings, Montana was made, what role did

5    you have?

6        A      Okay.  When we got the call, then

7    the roles switched because he needed to do

8    his -- his -- his duties.  He was called in to

9    medical and take care back of the back, so I

10   became the pilot flying and he became the

11   non-flying pilot.

12       Q      All right, did you talk to the

13   medical folks over the radio?

14       A      No, I didn't.

15       Q      Did you talk to management at any

16   time, JetBlue management, while you were in

17   the air?

18       A      No, I didn't.

19       Q      And who landed the plane?

20       A      Mitch landed the plane.

21       Q      And once the plane landed what did

22   you do?

23       A      Did my first officer duty, normal

24   duties in the cockpit.

25       Q      Is that shutting the plane down?

Page 19

1                              Cheney
2    other situations where JetBlue removed a
3    person of color from a plane?
4              MS. JORGENSEN:  Object to form.
5        A    I was on an aircraft where they
6    removed, but as far as color, I can't tell
7    you, you know.
8        Q    Tell us what happened when you were
9    on an aircraft.  When was it?  Where was it?
10       A    That happened several times during
11   the past year, you know.  Before the plane
12   even left the gate maybe a drunk passenger or
13   intoxicated passenger.  They asked him to
14   be -- that's something we don't handle.
15             You know, they might ask the
16   Captain, you know, his -- his take on it and
17   it's basically up to the Captain's decision if
18   he wants the customers removed or not, so...
19       Q    Okay.  And have you ever seen an
20   incident when you're on the plane and the
21   plane has to divert as a result of something
22   happening on the plane?  Besides this one.
23       A    Yes.
24       Q    Tell us about that?
25       A    We had to divert because somebody

Page 20

                         Cheney

1    was going to -- I believe it was Fort

2    Lauderdale and we had to divert them to

3    Orlando because the guy was going to a drug

4    rehab and I guess he was going through some

5    drug issues or withdrawal so --

6        Q    On the plane?

7        A    Yeah.  And he was making -- making

8    quite a scene in the back, so we diverted.

9    And the dates, I don't remember if it happened

10   before or after, but, you know, that's --

11       Q    Do you remember what flight you

12   were on, from where?  From what city to what

13   city?

14       A    For -- for the -- no, I don't

15   remember.

16       Q    Okay, and the fellow who had the

17   drug issue that caused you to divert to Fort

18   Lauderdale, did you leave the cockpit to see

19   what was going on?

20       A    We landed, but by the time we got

21   there the medical personnel was already in the

22   back and checking him out.

23       Q    How did you learn while the plane

24   was in the air what was going on that caused

Page 21

1                              Cheney

2  the pilot to divert?

3        A       The flight attendant called up to

4  the Captain.

5        Q       And did you talk to the flight

6  attendant?

7        A       I don't remember if I, in that

8  case, if I talked to the flight attendant or

9  not.   Usually the Captain will answer that

10  from the back and -- and, you know, through

11  discussions he said, you know, he might have

12  mentioned, hey, we have an issue in the back

13  with a customer, so...

14        Q       Is it fair to say that during that

15  incident you also took over flying the plane

16  and the pilot took over the responsibilities

17  associated with the issue?

18        A       In that case, yes, yes.   I did

19  actually.

20        Q       Okay.

21        A       Actually, that case I was the pilot

22  flying.

23        Q       Oh, okay.

24        A       Yeah.   Yeah, in that case.   We swap

25  out every other leg to fly.

Page 22

Cheney

1

2      Q      I see.  Okay.  So -- so in that

3  particular case were the police involved?

4      A      I do believe a policeman was there,

5  but I knew it was, you know, your typical

6  paramedics.

7      Q      Okay.  Did -- so you could hear

8  what the pilot was saying in the cockpit

9  because you were right next to the pilot,

10  right?  When he was on the radio?

11      A      Yeah.

12      Q      Okay, and did the pilot in the Fort

13  Lauderdale situation contact the -- is it the

14  Med Ex or Med something?

15      A      MedLink, yes.  Yes.

16      Q      MedLink.  And you could hear what

17  he was saying, right?

18      A      In that case if I'm doing the

19  radios and I'm concentrating on the ATC, I'll

20  probably turn to down, but I'll have a general

21  idea of why -- of what's going on and

22  thinking, in my mind, because we're both

23  thinking the same, we might have to divert

24  just in case, you know, so...

25              But there's so much -- the

Page 23

1                           Cheney

2    information that they're relaying through each

3    other, it will just, you know, is -- it will

4    probably interfere with my duty to -- to, you

5    know, concentrate on what ATC is wanting me to

6    do, so I normally turn it down.

7         Q    Got it.  All right, and with your

8    headset can you hear the Captain talking just

9    because you're sitting next to him?

10        A    It's loud, you know.  You know, we

11   put on our, you know, headset.  You know, you

12   could.  Yeah, yeah.

13        Q    All right.  So in the Fort

14   Lauderdale diversion did you hear the Captain

15   give a direction to -- to have the person met

16   by EMTs or something like that?

17        A    Did I hear?

18        Q    The captain make the request to

19   have EMTs present upon landing.

20        A    When he relayed the message to me?

21        Q    Oh, are you the guy who made the

22   call?

23        A    No, no.  He made the call.

24        Q    Okay.

25        A    You know, talking with MedLink.

Page 24

```
 1                        Cheney
 2        Q        Right.
 3        A        I'm flying -- flying the airplane.
 4        Q        Right.  So did he communicate to
 5   you that look, we're going to have an
 6   ambulance there.  We're going to land and this
 7   is what we're going to do?
 8        A        He'll ask me, could you tell ATC,
 9   this is going to be a medical emergency.  We
10   need to go to Orlando, you know.
11             And I said, okay and I'll contact
12   the ATC in that case.
13        Q        Okay.  And --
14        A        But he'll tell -- tell me.
15        Q        Okay, he'll tell you.  Okay.
16             And in that case who made the
17   decision to go to -- to go -- is it Fort
18   Lauderdale was the diversion or Orlando?
19        A        Fort Lauderdale -- Fort Lauderdale
20   was -- was the destination, Orlando was the
21   diversion.
22        Q        So who made the decision to go to
23   Orlando?
24        A        The Captain.
25        Q        The Captain, all right.
```

1                           Cheney

2                   And that was while he was

3    communicating with the MedLink folks?

4        A       More -- more likely they -- they

5    decide what they -- want us to do and then he

6    relays, you know.   If we need to divert, he'll

7    stop what he's doing, you know, communication

8    wise and tell me, hey, this is what we need to

9    do.

10       Q       All right, so in that case he told

11   you -- the pilot told you, look, we're going

12   to Orlando and then your job is to talk to the

13   traffic control?

14       A       Coordinate with ATC and they'll ask

15   questions why?   Say it's a medical emergency.

16   And when you tell them that, you know.

17                   And then we might just call the

18   company too on the company radio frequencies

19   and tell them, you know, we'll need, you know,

20   make sure paramedics are there plane side

21   waiting for us.

22       Q       Did that happen in the Orlando

23   diversion, that you called the company?

24       A       Yeah.   Called the Orlando flight

25   ops.

Page 26

1                        Cheney

2        Q      Okay, and is that a JetBlue company

3   or organization?

4        A      Yeah, yeah.  Because we have a base

5   there, too.  We have ground -- ground person,

6   you know, personnel there.

7        Q      Okay.  And so when you call flight

8   ops do you call them on a radio?

9        A      Radio.

10       Q      Okay.  And these radios, do most

11  planes have -- what is it, two radios?

12       A      We have two.

13       Q      And no satellite phone?

14       A      Some of our planes have sat phone.

15  I don't -- I'm not 100 percent sure, but I

16  don't think this particular airplane had a sat

17  phone.

18       Q      Okay.  All right.

19       A      Because -- yeah, it was a radio.

20       Q      Okay, now let's go back to the

21  flight involving Mr. Karrani and the medical

22  issue.

23              So did the same thing happen in

24  this situation as you just described in the

25  Orlando diversion situation where the Captain

Page 27

1                          Cheney

2   told you information and you relayed it to the

3   air traffic controllers?

4        A       Right.

5        Q       Okay, so tell us what did the

6   captain tell you was happening and what did

7   you relay to air traffic control?

8        A       As soon as he got the information

9   with MedLink and they -- and they recommended

10  that we divert, we kind of knew we might have

11  to just from, you know, we might have to.  You

12  know, you always want to, you know, you want

13  prepare yourself so I was looking at --

14              (Reporter requested clarification.)

15       A       We were looking at going -- going

16  to Billings, you know.  That's just a, you

17  know, just in case, you know.  So we're always

18  looking at places where to land.  So when he

19  gave -- when he gave a thumbs up or, you know,

20  yeah, you know, he -- he told me we need to go

21  to Billings.

22       Q       Okay.  And who did you contact?

23       A       I was on with ATC.

24       Q       Air traffic control?

25       A       Air -- air -- yes.  Yes, the air

Page 28

```
 1                        Cheney
 2  traffic control.
 3       Q      Is that Billings air traffic
 4  control?
 5       A      It's center.  At the time
 6  there's -- yeah, it's -- it might have been
 7  Seattle Center.
 8       Q      Okay.
 9       A      Something like that.
10       Q      All right.  And what did you tell
11  them?
12       A      Tell them we -- we've got a
13  medical -- this is not ver- -- you know,
14  verbatim.  This is --
15       Q      Sure, I understand.  A summary.
16       A      You know, we have a medical
17  emergency.  We're going to need to divert to
18  Billings.
19       Q      All right.  And then did you call
20  anybody else besides air traffic control at
21  that time?
22            MS. JORGENSEN:  Object to form.
23       A      No.  Just -- just the air traffic
24  controller.
25       Q      All right.  And so from the -- how
```

Page 32

Cheney

2      A      Both of us can hear it if we have

3  the volume up.

4      Q      Okay, and -- okay, so it it's not

5  coming through the head phones.  It's

6  basically coming just --

7      A      It's coming through the head

8  phones.

9      Q      Oh, it is.  Okay.

10     A      Yes.

11     Q      So if he's got the volume up -- if

12 the Captain's got the volume up and you've got

13 the volume up, you can both here what's coming

14 from the cabin?

15     A      Yes.

16     Q      So what did you hear from the

17 cabin?

18     A      Heard the call, turned it up.  You

19 know, turned it on.  He answered, we need

20 law -- law enforcement to meet us at the

21 airplane.

22     Q      Who said that?

23     A      One of the flight attendants.

24 Don't know who, but one of the flight

25 attendants.

1                          Cheney

2          Q      Male or female?

3          A      Female.

4          Q      Okay, said -- so the words that you

5   heard were "we need law enforcement"?

6          A      I don't know if that's the verbatim

7   what they said, but it was in that nature.

8   You know, we need --

9          Q      Okay.

10         A      -- authorities, airport authorities

11  or the, you know, police, but it's --

12         Q      Did the voice at the other end of

13  the phone say why?

14         A      No.

15         Q      Okay, so from your perspective then

16  that -- you would -- that would be a big deal,

17  wouldn't it, that we need law enforcement?

18         A      Yeah, but we're on approach and my

19  main -- main concern was helping them get the

20  airplane on the ground.

21         Q      Okay.

22         A      Right.

23         Q      And I know you answered this, but I

24  forgot.  Who landed the plane, you or the

25  pilot?

Page 35

                         Cheney

1

2    or are they allowed to do other things?

3        A     They're allowed to -- to make sure

4    that the plane is secured in the back.  I'm

5    not quite sure what their full duties are, but

6    I know before they just know when to sit down

7    and to have their seat belts on.

8        Q     All right.  And based on your

9    recollection of the events, when that call

10   came in that says "we need law enforcement,"

11   am I right that this was before wheels down,

12   but below 10,000 feet?

13       A     It was below -- it was before

14   wheels down, right.

15       Q     And below 10,000 feet?

16       A     Right.

17       Q     Got it.  All right.

18             And how long was that phone call

19   that, you know, "We need law enforcement"?

20       A     It was quick.

21       Q     Like that (indicating snapping of

22   fingers)?

23       A     It was quick.  Yeah, I think.

24       Q     So in this particular scenario is

25   it fair to say the captain did not inquire

Page  36

1                    Cheney

2  further?   Just said okay?

3       A      I don't remember if he did or not.

4  All I know was -- was I heard what I needed to

5  hear and I contacted, you know, approach and

6  also, sir, we need a law -- law enforcement to

7  meet us at the airplane.

8       Q      All right.

9       A      Now, I don't know if he -- I don't

10  remember if he had another, you know,

11  conversation.

12       Q      Did you have any more detailed

13  conversations with the Billings -- you said

14  air traffic controller?

15       A      Air traffic control, yeah.

16  Approach control.

17       Q      Did you have any more detail

18  conversations to talk about why you needed law

19  enforcement?

20       A      No.  Just told them we need it and

21  they said "Roger" or whatever.  We'll -- we'll

22  have them standing by or in that nature.

23       Q      Got it.  Okay.

24       A      Didn't -- didn't go into details

25  with them.

Page 51

                              Cheney

1

2    continue doing her job?

3         A      I believed after got back on the

4    airplane and the door was open, walked in and

5    the captain mentioned that we're -- she's not

6    going to be able to do this flight.  So we're

7    going to have to come up with some options.

8    That's when he had another issue dealing.  He

9    had to call the company and --

10        Q      What was that?

11        A      He had to call the company and

12   explain to them the situation that we've got

13   folks on board and we're not going to be able

14   to do this flight.

15        Q      Okay, and were you there for that

16   conversation with corporate?

17        A      I was -- I don't remember.  I might

18   have been.  I was sitting there, you know,

19   trying to prepare myself for the next flight.

20   He was on the phone and I wasn't really

21   listening in.

22        Q      Was the plane empty of passengers

23   by this time?

24        A      At that time?  I don't remember,

25   but I'm guessing they're still on board

Page 59

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK )
                       ) ss.:
4    COUNTY OF RICHMOND)

5

6              I, ELIZABETH SANTAMARIA, a

7    Registered Professional Reporter and Notary

8    Public of the  State of New York, do hereby

9    certify that the foregoing Deposition of the

10   witness MICHAEL CHENEY taken at the time and

11   place aforesaid, is a true and correct

12   transcription of my shorthand notes.

13             I further certify that I am neither

14   counsel for nor related to any party to said

15   action, nor in any way interested in the

16   result or outcome thereof.

17             IN WITNESS WHEREOF, I have hereunto

18   set my hand this 11th day of March, 2019.

19

20             _____

21             ELIZABETH SANTAMARIA

22

23

24

25

**EXHIBIT B**

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
 2                             AT SEATTLE

 3

 4
     ABDIKARIM KARRANI,
 5
                 Plaintiff,
 6
     vs.                          CASE NO:  2:18-CV-01510-RSM
 7
     JET BLUE AIRWAYS
 8   CORPORATION,

 9               Defendant.

10   _____/

11   DEPOSITION OF:          JASON SMITH

12   DATE:                   FRIDAY, APRIL 26, 2019

13   TIME:                   3:00 P.M. - 3:22 P.M.

14   PLACE:                  ESQUIRE DEPOSITION SOLUTIONS
                             1301 RIVERPLACE BOULEVARD
15                           SUITE 1610
                             JACKSONVILLE, FLORIDA 32207
16
     STENOGRAPHICALLY
17   REPORTED BY:            CATHERINE M. MORROW

18

19

20

21

22

23

24

25
```



1  about what they saw?

2       A    No.  I went straight for an outlet to charge

3  my phone.

4       Q    Fair enough.

5       A    That is the first thing I was thinking about,

6  texting my wife.  That was it.  I don't recall talking

7  to anybody.

8       Q    All right.  Anything else you remember besides

9  what you've told us?

10      A    No.  That's about it.  That's what --

11  timeline-wise about it was, you know, apparently off and

12  on when they took her off the plane, the medical, when

13  it happened.

14           I felt like that was, probably, maybe out of

15  order.  But those are brief little things I saw.

16      Q    All right.

17      A    A lot of things are really cloudy.

18           MR. SHERIDAN:  Okay.  I have no further

19      questions.

20                    CROSS-EXAMINATION

21  BY MS. JORGENSEN:

22      Q    Sorry.  Just catching up to you.  I just want

23  to make sure that I understand your recollection.  You

24  described, if I heard you incorrectly let me know, you

25  described what you call a verbal confrontation at front



1    of the plane?

2        A    Yeah.  It was not a heated.  It was two people

3    talking back and forth.  It wasn't any yelling or

4    anything like that.  It was they were saying something

5    to each other.  I am not positive what was said, but

6    they were saying something.

7        Q    So that was my point of clarification.  I

8    wanted to know if from what you described was that what

9    you assumed was happening based on their body language

10   because you couldn't hear the words being exchanged or

11   did you hear the exchange?

12       A    I heard her say "No, you cannot be up here at

13   this time."  I heard her say that.  Because she got a

14   little bit louder to make her point, hey, you can't --

15   you have to follow my -- what I'm telling you.  She is

16   the flight attendant.  She lets us know what we can and

17   cannot do.

18            But based on body language, yes, it seemed

19   like they were both getting irritate with each other.

20   Yes.

21       Q    So you heard her advise he couldn't be where

22   he was?

23       A    Yes.  She said no.  You cannot be up here.

24   Sorry.

25       Q    No, I'm sorry.  And did he continue to try to



1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF DUVAL:

4

5        I, Catherine M. Morrow, Notary Public, State of

6    Florida, certify that I was authorized to and did

7    stenographically report the deposition of Jason Smith;

8    that a review of the transcript was requested; and that

9    the foregoing transcript, pages 4 through 19, is a true

10   and accurate record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17       DATED this 9th day of May, 2019.

18

19

20       _____

21                    Catherine M. Morrow

22

23

24

25

